1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CAROL A. WOISCHKE,

              Plaintiff,

   v.

JO ANNE B. BARNHART, Commissioner of
Social Security,

             Defendant.

CASE NO.    C04-5624RBL

REPORT AND
RECOMMENDATION

Noted for November 11, 2005

Plaintiff, Carol A. Woischke, has brought this matter for judicial review of the denial of her

applications for disability insurance and supplemental security income ("SSI") benefits.  This matter has

been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local

Magistrates Rule MJR 4(a)(4) and as authorized by Mathews, Secretary of H.E.W. v. Weber, 423 U.S. 261

(1976).  After reviewing the parties' briefs and the remaining record, the undersigned submits the following

report and recommendation for the Honorable Ronald B. Leighton's review.

FACTUAL AND PROCEDURAL HISTORY

Plaintiff currently is forty-two years old.[1] Tr. 38.  She graduated from high school and completed one year of college. Tr. 77.  She has past work experience as a veterinary assistant and cashier. Tr. 18, 72, 80.

Plaintiff originally filed applications for disability insurance and SSI benefits in 1992.  Tr. 17.  Both applications were denied initially on May 1, 1992.  Id.  Plaintiff did not appeal that denial.  Id.  She again filed applications for SSI and disability insurance benefits on August 27, 2001, and September 12, 2001, respectively, alleging disability as of January 1992, due to cluster headaches, migraine headaches with vision loss, temporomandibular joint ("TMJ") disorder, tinnitus in both ears, a history of two aneurysms, and panic attacks. Tr. 18, 62, 71, 356.  Her applications were denied initially and on reconsideration. Tr. 38-40, 45, 359-61.

Plaintiff requested a hearing, which was held on July 14, 2003, before an administrative law judge ("ALJ"). Tr. 376.  At the hearing, plaintiff, represented by counsel, appeared and testified, as did a medical expert and a vocational expert. Tr. 376-422.  On December 29, 2003, the ALJ issued a decision determining plaintiff to be not disabled, finding in relevant part as follows:

(1)  at step one of the disability evaluation process, plaintiff had not engaged in substantial gainful activity since her alleged onset date of disability;

(2)  at step two, plaintiff had "severe" impairments consisting of an anxiety disorder, a somatic pain disorder, depression, some intellectual deficits, low back pain, cervical pain, and headaches;

(3)  at step three, none of plaintiff's impairments met or equaled the criteria of any of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1;

(4)  at step four, plaintiff had the residual functional capacity to perform a modified range of light work, which precluded her from performing her past relevant work; and

(5)  at step five, plaintiff was capable of performing other jobs existing in significant numbers in the national economy.

Tr. 23, 28-30.  The ALJ also denied plaintiff's request to reopen her 1992 applications. Tr. 17.  Plaintiff's request for review was denied by the Appeals Council on July 30, 2004 as well, making the ALJ's decision the Commissioner's final decision. Tr. 6; 20 C.F.R. §§ 404.981, 416.1481.

---

[1] Plaintiff's date of birth has been redacted in accordance with the General Order of the Court regarding Public Access to Electronic Case Files, pursuant to the official policy on privacy adopted by the Judicial Conference of the United States.

REPORT AND RECOMMENDATION
Page - 2

On September 24, 2004, plaintiff filed a complaint in this court seeking review of the ALJ's decision. (Dkt. #1). Specifically, plaintiff argues that decision should be reversed and remanded for an award of benefits, for the following reasons:

(a)    the ALJ erred in evaluating the medical evidence in the record;

(b)    the ALJ erred in finding plaintiff's mental impairments did not meet or equal the criteria of any of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1;

(c)    the ALJ erred in assessing plaintiff's credibility; and

(d)    the ALJ erred in finding plaintiff capable of performing other work existing in significant numbers in the national economy.

For the reasons set forth below, the undersigned finds the ALJ failed to include all of plaintiff's limitations in the hypothetical question posed to the vocational expert at step five of the disability evaluation process, and thus recommends the court reverse the ALJ's decision and remand it to the Commissioner for further administrative proceedings. As explained below, however, remand here is solely for the purpose of re-determining whether plaintiff was disabled for purposes of entitlement to SSI benefits beginning August 27, 2001, the date she protectively filed her application for such benefits.

## DISCUSSION

This court must uphold the Commissioner's determination that plaintiff is not disabled if the Commissioner applied the proper legal standard and there is substantial evidence in the record as a whole to support the decision. Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Fife v. Heckler, 767 F.2d 1427, 1429 (9th Cir. 1985). It is more than a scintilla but less than a preponderance. Sorenson v. Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975); Carr v. Sullivan, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991). If the evidence admits of more than one rational interpretation, the court must uphold the Commissioner's decision. Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1984).

I.    Plaintiff's Date Last Insured

Unlike SSI benefits, to be entitled to disability insurance benefits, plaintiff "must establish that her disability existed on or before" the date her insured status expired. Tidwell v. Apfel, 161 F.3d 599, 601 (9th Cir. 1998); see also Flaten v. Secretary of Health & Human Services, 44 F.3d 1453, 1460 (9th Cir. 1995)

(social security statutory scheme requires disability to be continuously disabling from time of onset during insured status to time of application for benefits, if individual applies for benefits for current disability after expiration of insured status). Plaintiff's date last insured was December 31, 1992. Tr. 39. Therefore, to be entitled to disability insurance benefits, plaintiff must establish she was disabled prior to or as of that date. Tidwell, 161 F.3d at 601. As discussed below, however, plaintiff has not done so.

With respect to plaintiff's application for disability insurance benefits, the ALJ found as follows:

> As noted above, the claimant's previous application was denied in May 1992. That determination covered the period of January to May, 1992. That period having been previously determined, this decision is limited to the period starting May 2, 1992 and thereafter. Based on the record before me, I cannot find a period of 12-months continuous disability starting on or after May 2, 1992. While the record shows claimant was status-post a balloon occlusion of the left ICA and did have the severe impairment of migraine headaches during this period, they were not at a disabling level of severity for the requisite 12 month period.

Tr. 27. Thus, the ALJ found plaintiff had "no period of disability" prior to her date last insured. Id. The undersigned finds the ALJ's determination on this issue is supported by substantial evidence.

A.   Plaintiff's Physical Impairments

Plaintiff underwent successful occlusion procedures for her aneurysms in late December 1991 and late January 1992. Tr. 132, 139. In late May 1992, plaintiff reported she felt as if she was "moving too slow." Tr. 227. However, her objective test scores were all "within or faster" than the expected norm for reaction times. Tr. 227, 232. Also in late May, and then again in late October, 1992, plaintiff visited the emergency room for complaints of low back and radicular pain. Tr. 240-41. However, both examinations were fairly unremarkable. Id. She further reported in August 1992, feeling "so much better" and having no problems because her headaches had decreased. Tr. 213.

Also in late October 1992, plaintiff was found to have been stable since her January 1992 surgical procedure, albeit with "noted continued intermittent visual obscurations and recent increase in headaches." Tr. 167. Although plaintiff had decreased sensation on the right side of her face and in her right neck and shoulder, she had full motor strength and normal sensation in her extremities and intact coordination. Id. Plaintiff underwent a neurological examination in late October 1992 as well, reporting that by late April 1992, she had been feeling "slightly better," although "not back to normal," with less problems with her vision. Tr. 173. Her neurologic examination was largely unremarkable, with "no definite abnormalities." Tr. 174-75. She was assessed with a history "consistent with classic migraine." Tr. 175.

Plaintiff saw Dr. John S. Wendt, a specialist in psychiatry and neurology, in late January 1993 for her migraine headaches. However, her examination at the time again was largely unremarkable, except for some tenderness in her spine and jaw, a "slight" decrease in sensation over the right side of her face, and a "slightly decreased" right biceps reflex. Tr. 245. Diagnostic notes from Dr. Wendt reveal that plaintiff's migraine headaches continued to improve on medication through at least late March 1995. Tr. 261, 263-66. While she reported that her neck pain and headaches were "becoming slightly more of a problem" in late September 1995, and she had some back tenderness on examination, plaintiff stated that her headaches and neck pain were manageable on her current regimen of medication in late March 1996. Tr. 261.

The record therefore shows that plaintiff's headaches and neck and back pain were fairly mild and improving for the most part through late March 1996. See also Tr. 282, 285, 318. It further reveals that by late August 1992, plaintiff had made significant progress in her physical therapy, including tolerating her exercise program well, being able to do more household chores, and engaging more in such leisure time activities as driving, swimming and playing badmitten. Tr. 209. It was noted again in early September 1992, that plaintiff had "made progress in physical therapy, with decreased pain and increased functional mobility, as well as ability to perform activities during the day." Tr. 200. Accordingly, she was discharged from physical therapy at that time. Tr. 201.

B.     Plaintiff's Mental Impairments

The medical evidence in the record regarding plaintiff's mental impairments is equally minimal for the period prior to and as of her date last insured. Neurological testing performed in late December 1991, showed plaintiff was operating between the low average and borderline ranges, with "very mild to mild" cerebral dysfunction suggested. Tr. 159. A speech and communication evaluation performed in May 1992, was largely within normal limits, with only mildly impaired verbal expression and moderate impairments in attention/concentration and memory. Tr. 219-24. Plaintiff's executive functioning appeared to be a "relative strength," and her prognosis was deemed to be "very good." Tr. 219, 224.

Substantially similar findings again were obtained in early August 1992, and this time plaintiff's prognosis was deemed to be "excellent." Tr. 212-17. She was found to have made "significant gains" in "all deficit areas since initial testing" in May and June 1992, including with respect to her attention and memory. Tr. 210-11. Plaintiff further reported doing "much better," in part due to the counseling she was receiving

at the time. Tr. 211.  The record does contain additional psychological evaluations concerning plaintiff's mental status.  All of those evaluations, however, are dated well after plaintiff's insured status had expired.  None of them, furthermore, establish she was disabled prior to or as of her date last insured due to her mental impairments.

Although a neuropsychological evaluation performed by John Ernst, Ph.D., in mid-August 1994, showed deficits in various cognitive areas, including concentration and memory, this evaluation did not occur until almost twenty months after plaintiff's insured status had expired. Tr. 252-53.  In addition, Dr. Ernst made no finding that such deficits were present prior to or as of her date last insured.  It is true that Edwin L. Hill, Ph.D., who also conducted a neuropsychological evaluation in the early part of 2001, did state that plaintiff had cognitive problems from her 1992 surgery. Tr. 275.  However, his conclusions focused on plaintiff's present symptoms.[2] Tr. 275-76.

Thomas Clifford, Ph.D., a non-examining consulting physician, did complete a psychiatric review technique form and mental residual functional capacity assessment form in late November 2001, covering the period of January 21, 1992, to the present, in which he found plaintiff exhibited a number of moderate to marked mental functional limitations. Tr. 287, 297, 300-03.  Those limitations, however, appear to be based primarily on the early 2001 evaluation provided by Dr. Hill (Tr. 303), which, as discussed above, fails to establish plaintiff was disabled prior to or as of her date last insured.  Indeed, a further review of the medical evidence in the record by Dr. Arthur L. Lewy, another non-examining consulting physician, shows that through at least mid-August 1994, none of plaintiff's cognitive limitations could be said to preclude employment. Tr. 316-17.

Dr. Lewy thus felt plaintiff had shown fewer and less severe mental functional limitations than had Dr. Thomas for the same time period, which also is consistent with the assessment of non-examining consulting physician Carla van Dam, Ph.D. Tr. 319, 329, 333, 335-38.  While it is true that Dr. Paul W. Hageman, who completed a mental residual functional capacity assessment form in late June 2003, opined that plaintiff exhibited many moderate to marked mental functional limitations that began following her surgery in 1992, and that have lasted for at least twelve continuous months (Tr. 351-53), as discussed

---

[2]Although it is possible for a claimant to establish "continuous disabling severity by means of a retrospective diagnosis," as just discussed, such is not the case here. Flaten, 44 F.3d at 1461 (claimant is eligible for coverage only if current period of disability extends back continuously to onset date prior to date last insured).

below, the ALJ properly rejected Dr. Hageman's opinion as brief, conclusory and inadequately supported by any clinical findings.

The undersigned thus finds that the ALJ properly determined plaintiff failed to establish disability prior to the expiration of her insured status and, therefore, was not entitled to disability insurance benefits. Accordingly, the remaining question is whether plaintiff is entitled to SSI benefits beginning on August 27, 2001, the protective filing date of her application for such benefits. As such, the remainder of this order focuses on whether the ALJ properly found plaintiff not disabled as of that date. As explained in further detail below, the undersigned finds the ALJ did not do so.

II.      The ALJ Properly Evaluated the Medical Evidence in the Record

The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the medical evidence. Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998). Where the medical evidence in the record is not conclusive, "questions of credibility and resolution of conflicts" are solely the functions of the ALJ. Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982). In such cases, "the ALJ's conclusion must be upheld." Morgan v. Commissioner of the Social Security Administration, 169 F.3d 595, 601 (9th Cir. 1999). Determining whether inconsistencies in the medical evidence "are material (or are in fact inconsistencies at all) and whether certain factors are relevant to discount" the opinions of medical experts "falls within this responsibility." Id. at 603.

In resolving questions of credibility and conflicts in the evidence, an ALJ's findings "must be supported by specific, cogent reasons." Reddick, 157 F.3d at 725. The ALJ can do this "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." Id. The ALJ also may draw inferences "logically flowing from the evidence." Sample, 694 F.2d at 642. Further, the court itself may draw "specific and legitimate inferences from the ALJ's opinion." Magallanes v. Bowen, 881 F.2d 747, 755, (9th Cir. 1989).

The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of either a treating or examining physician. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996). Even when a treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." Id. at 830-31. However, the ALJ "need not discuss *all* evidence presented" to him or her. Vincent on Behalf of Vincent v. Heckler, 739 F.3d 1393, 1394-95 (9th Cir. 1984) (citation omitted) (emphasis in the original). The ALJ must only explain

1   why "significant probative evidence has been rejected." Id.; see also Cotter v. Harris, 642 F.2d 700, 706-07

2   (3d Cir. 1981); Garfield v. Schweiker, 732 F.2d 605, 610 (7th Cir. 1984).

3        In general, more weight is given to a treating physician's opinion than to the opinions of those who

4   do not treat the claimant. Lester, 81 F.3d at 830.  On the other hand, an ALJ need not accept the opinion of

5   a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings."

6   Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th

7   Cir. 2001); Magallanes, 881 F.2d at 75.  An examining physician's opinion is "entitled to greater weight

8   than the opinion of a nonexamining physician." Lester, 81 F.3d at 830-31.  A nonexamining physician's

9   opinion may constitute substantial evidence if "it is consistent with other independent evidence in the

10  record." Id. at 830-31; Tonapetyan, 242 F.3d at 1149.

11       A.    Dr. Johnson

12       At the hearing, Dr. C. R. Johnson testified that plaintiff had an anxiety disorder, a somatic pain

13  disorder and depression. Tr. 411.  He testified that plaintiff might equal or meet the criteria for a listed

14  impairment under 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.02, explaining that:

15       [H]er restrictions of activities of daily living are moderately impacted.  Her difficulties in
         maintaining social functioning are mild to moderately impacted.  I think she does maybe
16       have marked difficulties in maintaining concentration, persistence, and pace.  And to
         meet a listing I think you have to have two of those things.  I don't have sufficient
17       evidence for repeated episodes.

18  Tr. 412.  Dr. Johnson further testified that he based his opinion regarding whether plaintiff met or equaled a

19  listing on the conclusions contained in the opinion provided by Dr. Hill in early 2001. Tr. 274-76, 412.  On

20  the other hand, he admitted that neuropsychological testing did "not bear out a significant cognitive problem

21  with concentration." Tr. 415.  Instead, Dr. Johnson felt it was plaintiff's persistence and pace, rather than

22  her concentration, that were more impaired, based on her testimony and reports concerning the frequency of

23  her panic attacks and difficulty maintaining a schedule. Id.

24       With respect to the opinion provided by Dr. Johnson, the ALJ found as follows:

25       [T]he doctor's acceptance of the claimant's testimony as creditable [sic] inconsistent
         with her own testimony and reports in settings other than the hearing.  Moreover, when
26       questioned as to the extensive testing results of the 2001 neuropsychological evaluation
         (Exhibit 11F) not supporting that conclusion, Dr. Johnson stated that his opinion was
27       based more on the claimant's lack of ability to maintain persistence and pace rather than
         problems with concentration.  He felt that she would have difficulty in maintaining a
28       schedule.  Other than self-reports of the claimant, the evidence does not show any
         objective evidence of problems with persistence or pace, or with keeping a schedule.

> None of her treatment providers noted observations it [sic] this regard.  Therefore, the opinion of Dr. Johnson is given little weight.

Tr. 25-26.  Plaintiff argues the above findings are improper because the ALJ failed to refer to any medical evidence in rejecting Dr. Johnson's opinion.  Plaintiff further argues the ALJ's statement that none of her treatment providers noted observations regarding her persistence or pace is without merit.

The undersigned does not find that the ALJ failed to refer to any medical evidence in the record in rejecting Dr. Johnson's opinion.  For example, as noted above, the ALJ specifically referred to the 2001 neuropsychological evaluation as being inconsistent with plaintiff's own testimony and self-reports.  Dr. Johnson himself admitted that such testing did not support a finding that she had a significant cognitive problem with concentration.  In addition, also as noted above, the ALJ referred to the record as containing a lack of objective evidence of problems with persistence or pace, even though, as discussed below, the ALJ was incorrect in so finding.

The undersigned agrees that, contrary to the ALJ's statement, there is objective medical evidence in the record that plaintiff had problems with persistence or pace.  For example, in early 2001, Dr. Hill opined that she would be best suited for a job that allowed her to "work at her own pace." Tr. 275.  Dr. Clifford found her to be markedly limited in her ability to maintain persistence and pace, and Dr. van Dam found her to be moderately so. Tr. 297, 301, 329.  Dr. Lewy felt that she was moderately limited in her ability to perform at a consistent pace, that she would "persist poorly on jobs involving a high need for speed," and that her persistence and pace would "be best in positions where [she] could work more alone." Tr. 336-37.  Dr. Hageman opined that plaintiff was markedly limited in her ability to perform at a consistent pace. Tr. 352.  Thus, the record contains ample evidence of plaintiff's problems in these areas.

Nevertheless, it does appear that Dr. Johnson based his opinion largely on plaintiff's testimony and self-reporting, which, as discussed below, the ALJ properly discredited. Tr. 415; Tonapetyan, 242 F.3d at 1149 (ALJ may disregard medical opinion premised on claimant's complaints where record supports ALJ in discounting claimant's credibility); Morgan v. Commissioner of the Social Security Administration, 169 F.3d 595, 601 (9th Cir. 1999) (opinion of physician premised to large extent on claimant's own accounts of her symptoms and limitations may be disregarded where those complaints have been properly discounted).  As such, although the ALJ erred in stating that the record contains no objective evidence of problems with persistence or pace, the undersigned finds such error to be harmless. See Batson v. Commissioner of the

Social Security Administration, 359 F.3d 1190, 1197 (9th Cir. 2004) (applying harmless error standard);

Curry v. Sullivan, 925 F.2d 1127, 1131 (9th Cir. 1990) (holding ALJ committed harmless error).

B.   Dr. Hageman

In late June 2003, Dr. Hageman completed a mental residual functional capacity assessment form in which he found plaintiff exhibited many moderate to marked mental functional limitations. Tr. 351-53.  He opined that she had been so limited since 1992, and that those limitations had last for a continuous period of at least twelve months. Tr. 353.  Dr. Hageman further commented as follows:

> This patient has demonstrated somatiform [sic] pain disorder with panic and severe dysthymia following brain surgery in 1992.  She has not improved significantly in her complex of psychiatric and physical medical concerns over the past 10 years inspite [sic] of ongoing treatment.  Her prognosis is uncertain to poor to gain full time consistent employment in any job setting.

Id.  The ALJ rejected Dr. Hageman's opinion for the following reasons:

> In June, 2003, Dr. Hageman checked boxes indicating a number of moderate and marked mental limitations. (Exhibit 24F5)  Little weight was given this form, as it is just a form with boxes checked and little in the way of explanation or support for his conclusions and no other information from him.  There is, for example, no indication of whether he has ever treated the claimant, if so how often and when, no treatment notes and no specificity as to the signs, symptoms, or test results that underlie his conclusions.  There is no indication in the record as to what relationship Dr. Hageman has with the claimant.  There is no evidence of any evaluation or any treating relationship.  It appears that Dr. Hageman relied primarily on the self-reports of the claimant, of which there are significant concerns.

Tr. 24.

Plaintiff argues the ALJ erred here, because he rejected Dr. Hageman's opinion on the same basis that he rejected the opinion of Dr. Johnson, namely, that it was based upon the self-reports of plaintiff.  The undersigned, however, finds no error here.  The ALJ need not accept the opinion of an examining, or even a treating, physician, if it is "brief, conclusory, and inadequately supported by clinical findings." Thomas, 278 F.3d at 957; Tonapetyan, 242 F.3d at 1149; Magallanes, 881 F.2d at 75.  Here, as noted by the ALJ, the record contains no diagnostic notes or other treatment documentation from Dr. Hageman.  In addition, Dr. Hageman's opinion appears to consist of the kind of "check-the-box" standardized form that the Ninth Circuit disfavors. See Murray v. Heckler, 722 F.2d 499, 501 (9th Cir.1983) (expressing court's preference for individualized medical opinions over check-off reports).  Accordingly, the ALJ's reasons for rejecting Dr. Hageman's opinion were proper.

C.   Ms. Maynard

1    In late January 2003, Marian L. Maynard, M.A., wrote a letter, stating that she had been counseling

2    plaintiff since early December 2002, and that it was "of great concern" to her that plaintiff "be pressured

3    into returning to gainful employment with the degree of symptoms for panic and anxiety." Tr. 346.  In early

4    May 2003, Ms. Maynard opined that plaintiff was markedly impaired in her ability to: relate appropriately to

5    co-workers and supervisors; interact appropriately in public contacts; and respond appropriately to and

6    tolerate the pressures and expectations of a normal work setting. Tr. 342.  Ms. Maynard further opined that

7    mental health intervention was not likely to restore or substantially improve plaintiff's ability to work for

8    pay in a regular and predictable manner. Tr. 343.  She estimated that plaintiff would be so impaired for at

9    least two years. Id.

10   Mental health counselors are not "acceptable medical" sources as that term is defined in the Social

11   Security Regulations, and, therefore, their opinions may be given "less weight" than to those of licensed

12   physicians. See Gomez v. Chater, 74 F.3d 967, 970-71 (9th Cir. 1996) (acceptable medical sources include

13   licensed physicians); 20 C.F.R. § 404.1513(a), (d); 20 C.F.R. § 416.913(a), (d).  The ALJ, however, may

14   use evidence obtained from mental health counselors, and other such non-acceptable medical sources, to

15   show the severity of a claimant's impairments and how they affect the claimant's ability to work. 20 C.F.R.

16   § 404.1513(d); 20 C.F.R. § 416.913(d).  In other words, the opinion of a mental health counselor is treated

17   in the same manner as lay testimony rather than as that of a licensed physician.

18   Lay testimony regarding a claimant's symptoms "is competent evidence that an ALJ must take into

19   account," unless the ALJ "expressly determines to disregard such testimony and gives reasons germane to

20   each witness for doing so." Lewis v. Apfel, 236 F.3d, 503, 511 (9th Cir. 2001).  An ALJ may discount lay

21   testimony if it conflicts with the medical evidence. Id.; Vincent v. Heckler, 739 F.2d 1393, 1395 (9th Cir.

22   1984) (proper for ALJ to discount lay testimony that conflicts with available medical evidence).  In rejecting

23   lay testimony, the ALJ need not cite the specific record as long as "arguably germane reasons" for

24   dismissing the testimony are noted, even though the ALJ does "not clearly link his determination to those

25   reasons," and substantial evidence supports the ALJ's decision. Lewis, 236 F.3d at 512.  The ALJ also may

26   "draw inferences logically flowing from the evidence." Sample, 694 F.2d at 642.

27   Here, the ALJ dealt with the opinion evidence of Ms. Maynard as follows:

28   Marian L. Maynard, M.A., provides counseling to the claimant. (Exhibits 21F, 22F)  Her
      observations of the claimant having social difficulties were taken into account in the

1    residual functional capacity determination.  The other assessments she made appear to
2    be based solely on the self reports of the claimant, and given the credibility concerns, are
     given little weight.

3    Tr. 26.  It is not clear on what information or evidence Ms. Maynard based her opinion that plaintiff should

4    not be pressured into returning to gainful employment.  It is true that Ms. Maynard wrote in late January

5    2003, that she had been seeing plaintiff since early December, 2002.  However, this covers a period of less

6    than two months, and the record does not establish how often she saw plaintiff during that period.  For

7    example, the record contains no treatment or other diagnostic notes from Ms. Maynard for that period to

8    support the statements made in her letter.  Thus, it was not unreasonable for the ALJ to reject her opinion

9    for the reason that it appeared to be based solely on what plaintiff told her.  Indeed, plaintiff's self-reports

10   seem to be the basis for Ms. Maynard's early May 2003 opinion as well. Tr. 340-43.

11        D.    Ms. Kilventon

12        In early July 2003, Kady Kilventon, M.A., wrote a letter, stating that plaintiff had been a participant

13   in the state's division of vocational rehabilitation since late January 2001, and that:

14        Due to Carols [sic] significant barriers to employment none of the vocational goals or
          services aimed at assisting her with pursuing and achieving her goals were successful.
15        The barriers that were identified and discussed with Carol consisted of the following: her
          limited physical abilities, level of fatigue, migraine headaches which were unpredictable,
16        her ability to maintain a consistent work schedule which excluded most employment
          options outside of self employment, her mental health symptoms which consisted of
17        severe anxiety over making the commitment and following through with steps that were
          aimed at employment, agoraphobic traits which again affected her ability to engage in
18        overall employment related pursuits and her fixation on her disability related symptoms
          and how they limited her, which impeded her ability to focus on what she can do or was
19        capable of.

20   Tr. 120.  Ms. Kilventon further stated that it was her opinion that plaintiff's biggest barrier to employment

21   was her mental health symptoms, that she was not participating in vocational services, and that her file had

22   been closed "due to her barriers to employment as a result of her disabilities." Id.

23        The ALJ addressed Ms. Kilventon's opinion as follows:

24        Kady Kilvento [sic], MA, CRC, of DVR wrote a letter in July 2003 listing what she had
          concluded were the claimant's barriers to employment and said that the claimant needed
25        to address and make significant gains in addressing her mental health problems before
          reengaging DVR services. (Exhibit 11E1-2)  It appears that the claimant had been a
26        frustrating DVR client, not following through on services in the past and now appearing
          to present so many barriers that services were discontinued.  Again it must be noted that
27        the claimant's earnings record shows little by way of attempts at employment.  That
          record, from 1979 to present, shows that employment for the claimant was the exception
28        rather than the rule.  She rarely worked and even when she did, she did not work long.
          Given Dr. Hill's observation back in 2001 that the claimant had a strong interest in

staying home and getting a disability check rather than receiving retraining, the result at DVR is not surprising.  The claimant's stated motivation of the [sic] to maintain the lifestyle she desired is consistent with her actions during her interactions with DVR.  Therefore, the letter of Ms. Kilvento [sic], while considered creditable cannot be interpreted as an assessment of what the claimant's functional capacity was, but rather what she was willing to do.

Tr. 26.  Plaintiff argues the ALJ failed to reference what evidence in the record supported his conclusion that Ms. Kilventon did not know how to interpret her own data.

Plaintiff, however, mischaracterizes the ALJ's findings.  It is the ALJ's responsibility to determine credibility and resolve ambiguities and conflicts in the evidence.  Reddick, 157 F.3d at 722; Sample, 694 F.2d at 642.  This is exactly what the ALJ did here.  There is evidence in the record that plaintiff had issues with motivation to return to work.  For example, as noted by the ALJ, in his early 2001 evaluation of her, Dr. Hill stated that:

[Plaintiff] clearly seemed to feel that she was not capable of working on a full time basis and indicated that her primary reason for seeking DVR assistance was because of fears of losing her AFDC benefits in a few years and not having any means of supporting herself or her family.

Tr. 271.  In concluding his report, Dr. Hill further commented that:

It seemed clear from her description of her needs and interests that she would prefer to be found disabled by the Social Security Division of Disability Determination Services and receive a regular retirement check rather than go through vocational training and attempt to find work in the competitive marketplace.

Tr. 276.  Thus, while Dr. Hill also found plaintiff had other mental functional limitations that he expected would have an affect on her ability to return to competitive employment (Tr. 274-76), it is clear plaintiff's motivation was a significant part of the problem.  Indeed, Ms. Kilventon herself noted plaintiff's "fixation on her disability related symptoms and how they limited her." Tr. 120.  Therefore, while this is not the only barrier to employment Ms. Kilventon felt plaintiff had, it certainly was a "germane" reason for discounting her credibility in light of the other evidence in the record noted above.

III.  The ALJ Provided a Proper Step Three Analysis

To determine whether a claimant is entitled to disability benefits, the ALJ engages in a five-step sequential evaluation process. 20 C.F.R. §§ 404.1520, 416.920.  At step three of the disability evaluation process, the ALJ must evaluate the claimant's impairments to see if they meet or equal any of the impairments listed in 20 C.F. R. Pt. 404, Subpt. P, App. 1. 20 C.F.R (the "Listings"). §§ 404.1520(d), 416.920(d); Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999).  If any of the claimant's impairments

meet or equal a listed impairment, he or she is deemed disabled. Id.  The burden of proof is on the claimant

to establish he or she meets or equals any of the impairments in the Listings. Tacket, 180 F.3d at 1098.

A mental or physical impairment "must result from anatomical, physiological, or psychological

abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20

C.F.R. §§ 404.1508, 416.908.  It must be established by medical evidence "consisting of signs, symptoms,

and laboratory findings." Id.  An impairment meets a listed impairment "only when it manifests the specific

findings described in the set of medical criteria for that listed impairment." SSR 83-19, 1983 WL 31248 *2.

It equals a listed impairment "only if the medical findings (defined as a set of symptoms, signs, and

laboratory findings) are at least equivalent in severity to the set of medical findings for the listed

impairment." Id. at *2.  However, "symptoms alone" will not justify a finding of equivalence. Id.

Plaintiff argues she equals a listed impairment based on the opinion of Dr. Johnson.  As discussed

above, Dr. Johnson testified that plaintiff "might" equal the listed criteria for an organic mental disorder

secondary to her surgery in 1992. Tr. 411.  This was based on his opinion that plaintiff had moderate

restrictions in her activities of daily living, mild to moderate difficulties in maintaining social functioning,

and marked difficulties in maintaining concentration, persistence and pace. Tr. 412.  The ALJ, however,

rejected Dr. Johnson's opinion on this issue, and found that none of plaintiff's impairments met or equaled

any of those listed in 20 C.F. R. Part 404, Subpart P, Appendix 1. Tr. 23.

The limitations found by Dr. Johnson do not appear to equal the listed criteria for an organic mental

disorder.  The required level of severity for an organic mental disorder is met when:

> the requirements in both A and B are satisfied, or when the requirements in C are
> satisfied.
>
> A. Demonstration of a loss of specific cognitive abilities or affective changes and the
> medically documented persistence of at least one of the following:
>
> 1. Disorientation to time and place; or
>
> 2. Memory impairment, either short-term (inability to learn new information),
> intermediate, or long-term (inability to remember information that was known
> sometime in the past); or
>
> 3. Perceptual or thinking disturbances (e.g., hallucinations, delusions); or
>
> 4. Change in personality; or
>
> 5. Disturbance in mood; or

REPORT AND RECOMMENDATION
Page - 14

6. Emotional lability (e.g., explosive temper outbursts, sudden crying, etc.) and impairment in impulse control; or

7. Loss of measured intellectual ability of at least 15 I.Q. points from premorbid levels or overall impairment index clearly within the severely impaired range on neuropsychological testing, e.g., the Luria-Nebraska, Halstead-Reitan, etc.;

AND

B. Resulting in at least two of the following:

    1. Marked restriction of activities of daily living; or

    2. Marked difficulties in maintaining social functioning; or

    3. Marked difficulties in maintaining concentration, persistence, or pace; or

    4. Repeated episodes of decompensation, each of extended duration;

Or

C. Medically documented history of a chronic organic mental disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

    1. Repeated episodes of decompensation, each of extended duration; or

    2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

    3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.02.  Clearly plaintiff does not satisfy the requirements of B set forth above based upon Dr. Johnson's testimony, as well as the other medical evidence in the record. See Tr. 297, 329, 412.

Plaintiff also does not appear to meet the C requirements.  Dr. Johnson himself testified that there was insufficient evidence regarding repeated episodes of decompensation. Tr. 412.  While Dr. Hill, upon whose opinion the testimony of Dr. Johnson was based in part, found plaintiff would be "best suited" for a job that allowed her "to work at her own pace" and "with the maximum possible flexibility" (Tr. 275), there is no evidence in the record that even a minimal increase in her mental demands or a change to her environment would be predicted to cause her to decompensate.  Finally, although plaintiff has testified and reported receiving some help with her activities of daily living, there is no objective evidence in the record

that she has been or would be unable to function outside a highly supportive living arrangement.  Because, as discussed below, the ALJ properly discounted her credibility, the ALJ did not err in finding plaintiff did not equal a listed impairment.

IV.    The ALJ Did Not Err in Discounting Plaintiff's Credibility

Questions of credibility are solely within the control of the ALJ.  Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982).  The court should not "second-guess" this credibility determination.  Allen, 749 F.2d at 580.  In addition, the court may not reverse a credibility determination where that determination is based on contradictory or ambiguous evidence.  Id. at 579.  That some of the reasons for discrediting a claimant's testimony should properly be discounted does not render the ALJ's determination invalid, as long as that determination is supported by substantial evidence.  Tonapetyan v. Halter, 242 F.3d 1144, 1148 (9th Cir. 2001).

To reject a claimant's subjective complaints, the ALJ must provide "specific, cogent reasons for the disbelief."  Lester, 81 F.3d at 834 (9th Cir. 1996).  The ALJ "must identify what testimony is not credible and what evidence undermines the claimant's complaints."  Lester, 81 F.3d at 834; Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993).  Unless affirmative evidence shows the claimant is malingering, the ALJ's reasons for rejecting the claimant's testimony must be "clear and convincing."  Lester, 81 F.2d at 834.  The evidence as a whole must support a finding of malingering.  O'Donnell v. Barnhart, 318 F.3d 811, 818 (8th Cir. 2003).

In determining a claimant's credibility, the ALJ may consider "ordinary techniques of credibility evaluation," such as reputation for lying, prior inconsistent statements concerning symptoms, and other testimony that "appears less than candid."  Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996).  The ALJ also may consider a claimant's work record and observations of physicians and other third parties regarding the nature, onset, duration, and frequency of symptoms.  Id.

The ALJ discounted plaintiff's credibility in part for the following reason:

> The undersigned does not find the claimant's testimony to be particularly credible.  The claimant has sought very little treatment.  Were both her physical and mental conditions as persistent and severe as she alleges, it is likely she would have accessed more care to try and get improvement.  The record shows that claimant's symptoms had improved with treatment and she discontinued treatment with that improvement.

Tr. 23.  Failure to assert a good reason for not seeking, or following a prescribed course of, treatment, or a

finding that a proffered reason is not believable, "can cast doubt on the sincerity of the claimant's pain testimony." Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989). The substantial evidence in the record supports the ALJ's finding on this issue. As discussed above, the objective medical evidence in the record shows that plaintiff's headaches were improving on medication through at least late March 1996, and that she responded well to physical therapy.

In 1994, plaintiff also reported that she had "cut down considerably on her medications, finding that small doses" appeared to "work much better." Tr. 247. She continued to be doing "fairly well" in terms of her headaches as of early June 1999, and by early September 1999, she reported that her headaches were "generally doing okay" and that she felt she did "not need further treatment." Tr. 258-59. In early March 2000, her headaches were noted to be "status quo." Tr. 258. Plaintiff stated in early 2001 that biofeedback training "helped her to improve her control of panic attacks and migraine headaches." Tr. 269. Based on such evidence, the ALJ did not err in discounting plaintiff's credibility for this reason.

The ALJ also discounted plaintiff's credibility in part because of "[t]he combination of a poor work record and her expressed desire to be a stay-at-home parent," making "a secondary gain motivation behind her allegations appear likely." Tr. 24. The ALJ may consider "[m]otivation and the issue of secondary gain" in rejecting a claimant's symptom testimony. See Tidwell, 161 F.3d at 602; Matney on Behalf of Matney v. Sullivan, 981 F.2d 1016, 1020 (9th Cir. 1992). As discussed above, Dr. Hill noted that plaintiff's "primary reason for seeking DVR assistance was because of her fears of losing her AFDC benefits," and that she had "a strong interest in being present at home to be available to her children" rather than pursuing competitive full-time employment. Tr. 271, 276. Ms. Kilventon also noted "her fixation on her disability related symptoms and how they limited her." Tr. 120. Accordingly, the undersigned finds the ALJ did not err in discounting plaintiff's credibility for this reason as well.

To determine whether a claimant's symptom testimony is credible, the ALJ may consider his or her daily activities. Smolen, 80 F.3d at 1284. Such testimony may be rejected if the claimant "is able to spend a substantial part of his or her day performing household chores or other activities that are transferable to a work setting." Id. at 1284 n.7. The claimant need not be "utterly incapacitated" to be eligible for disability benefits, however, and "many home activities may not be easily transferable to a work environment." Id. Here, the ALJ further discounted plaintiff's credibility because she "admitted to being active all day and

evening with her projects and her crafts, as well as caring for several children, a variety of pets, as well as her yard and house." Tr. 22, 24.

Again, the undersigned finds the ALJ's determination on this issue is supported by the substantial evidence in the record. In early 2001, Dr. Hill noted plaintiff reported engaging in the following activities of daily living:

> Ms. Woischke states that on a typical day she arises at approximately 9 a.m. and gets her son off to school. She then has breakfast and watches television. She will then get out and do some yardwork, work on some crafts or do woodworking projects in her workshop. She has 3 dogs, a cat, 5 fish, and 2 rats and is responsible for caring for the animals. She states that in the afternoon she generally tries to stay outside in her workshops between 1 and 6 p.m. She also goes out there in the evenings after she puts her children in bed. She states she is independent for doing all the cooking, cleaning, laundry, and household activities of daily living. She states that she must do them on her own schedule and pace herself because of her limited endurance and stamina. She states she is very active in her childrens' lives and tries to be helpful to them with respect to their schoolwork and school projects. She reports she does not usually go to bed until 3 to 4 a.m.

Tr. 270. Thus, although plaintiff reported having to pace herself, the record shows that she has been fairly active and independent in her activities of daily living on a regular basis. As such, the ALJ also did not err in discounting plaintiff's credibility for this reason.

The ALJ provided two more reasons for discounting plaintiff's credibility: (1) her involvement in illegal drug activity raised concerns as to her veracity; and (2) her attendance and participation in drug treatment indicated she had more physical and mental abilities than alleged. Tr. 24. The undersigned finds it questionable as to whether plaintiff's past illegal drug activity has a substantial bearing on her veracity concerning her current applications for disability benefits. It also is not clear that plaintiff's attendance and participation in drug treatment alone shows greater physical and mental abilities. Nevertheless, the mere fact that some of the ALJ's reasons for discounting plaintiff's credibility are not legitimate, does not render the credibility determination invalid, as long as that determination is supported by substantial evidence in the record, as it is here. Tonapetyan, 242 F.3d at 1148.

Plaintiff argues the ALJ's credibility determination is erroneous because none of the treating or examining sources in the record called into question her credibility or suggested she was exaggerating her symptoms. While there may be no affirmative evidence in the record to show plaintiff was malingering, as discussed above, the ALJ set forth several valid reasons for finding plaintiff's testimony to be less than fully credible. Plaintiff further argues the ALJ misinterpreted her allegations, using them as a basis for finding she

1   lacked credibility rather than as a basis for finding she had a somatic pain disorder.  However, it is clear

2   from the record that plaintiff's headaches have improved on medication, that she has issues of motivation

3   and secondary gain, and that she is capable of engaging in activities of daily living at a level greater than

4   alleged.  As such, the undersigned cannot find fault with the ALJ determining that plaintiff's allegations of

5   disabling symptoms are less than credible.

6   V.      The ALJ Erred in Finding Plaintiff Not Disabled at Step Five of the Disability Evaluation Process

7          If a disability determination "cannot be made on the basis of medical factors alone at step three of

8   the evaluation process," the ALJ must identify the claimant's "functional limitations and restrictions" and

9   assess his or her "remaining capacities for work-related activities." Social Security Ruling ("SSR") 96-8p,

10  1996 WL 374184 *2.  A claimant's residual functional capacity assessment is used at step four to determine

11  whether he or she can do his or her past relevant work, and at step five to determine whether he or she can

12  do other work. Id.  Residual functional capacity thus is what the claimant "can still do despite his or her

13  limitations." Id.

14         A claimant's residual functional capacity is the maximum amount of work the claimant is able to

15  perform based on all of the relevant evidence in the record. Id.  However, a claimant's inability to work

16  must result from his or her "physical or mental impairment(s)." Id.  Thus, the ALJ must consider only those

17  limitations and restrictions "attributable to medically determinable impairments." Id.  In assessing a

18  claimant's residual functional capacity, the ALJ also is required to discuss why the claimant's "symptom-

19  related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the

20  medical or other evidence." Id. at *7.

21         If a claimant cannot perform his or her past relevant work, at step five of the disability evaluation

22  process the ALJ must show there are a significant number of jobs in the national economy the claimant is

23  able to do. Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. §§ 404.1520(d)-(e),

24  416.920(d)-(e).  The ALJ can do this through the testimony of a vocational expert or by reference to the

25  Commissioner's Medical-Vocational Guidelines (the "Grids"). Tackett, 180 F.3d at 1100-1101; Osenbrock

26  v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2000).

27         An ALJ's findings will be upheld if the weight of the medical evidence supports the hypothetical

28  posed by the ALJ. Martinez v. Heckler, 807 F.2d 771, 774 (9th Cir. 1987); Gallant v. Heckler, 753 F.2d

1450, 1456 (9th Cir. 1984).  The vocational expert's testimony therefore must be reliable in light of the

medical evidence to qualify as substantial evidence. Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988).

Accordingly, the ALJ's description of the claimant's disability "must be accurate, detailed, and supported by

the medical record." Embrey, 849 F.2d at 422 (citations omitted).  The ALJ, however, may omit from that

description those limitations he finds do not exist. Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001)

(because ALJ included all limitations that he found to exist, and those findings were supported by

substantial evidence, ALJ did not err in omitting other limitations claimant failed to prove).

      The ALJ assessed plaintiff with the following residual functional capacity:

> [T]o lift and/or carry twenty pounds on an occasional basis and ten pounds frequently;
> to stand and/or walk four hours in an eight hour workday and to sit for six hours out of
> an eight hour workday - in 1/2 hour to an hour increments; with no climbing of ladders,
> ropes or scaffolding; no working in environments with heights or hazards; and only
> occasionally climbing stairs or balancing.  The claimant has the ability to perform simple
> and repetitive tasks; but should have limited contact with the public and with co-
> workers.

Tr. 26.  Based on this residual functional capacity assessment, the ALJ posed a hypothetical question to the

vocational expert containing substantially the same limitations. Tr. 418-19.

      Plaintiff argues the hypothetical question the ALJ posed to the vocational expert did not include her

pain limitations or any of her limitations concerning persistence and pace.  As such, plaintiff asserts, the

vocational expert's testimony did not constitute evidence upon which the ALJ could rely in concluding she

was not entitled to benefits.  The undersigned finds that the record does not contain evidence of significant

pain limitations that are not already covered by the limitations included in the residual functional capacity

assessment and hypothetical question set forth above.  As discussed above, much of plaintiff's neck and

back pain and migraine headaches have improved on medication, and most of her physical examinations

have been largely unremarkable. Tr. 167, 173-75, 192-93, 200-01, 209, 213, 227, 232, 240-42, 245, 258-

61, 263-66, 282, 285, 310-14, 318, 349-50, 354-55.  On the other hand, the undersigned does find the ALJ

erred in failing to adequately address plaintiff's problems with persistence and pace assessing her residual

functional capacity.

      As discussed above, in early 2001, Dr. Hill opined that plaintiff would be best suited for a job that

allowed her to "work at her own pace." Tr. 275.  Dr. Clifford found her markedly limited in her ability to

maintain persistence and pace, and Dr. van Dam found her to be moderately so. Tr. 297, 301, 329.  Dr.

Lewy felt that she was moderately limited in her ability to perform at a consistent pace, that she would "persist poorly on jobs involving a high need for speed," and that her "persistence and pace" would "be best in positions where [she] could work more alone." Tr. 336-37. Dr. Hageman opined that plaintiff was markedly limited in her ability to perform at a consistent pace. Tr. 352. The record, therefore, does appear to contain ample evidence of plaintiff's problems in these areas.

This does not necessarily mean that the ALJ was required to include in his assessment of plaintiff's residual functional capacity or in the hypothetical question posed to the vocational expert any particular limitation with respect to persistence or pace. Rather, the undersigned merely finds that the ALJ did not properly address this issue. Accordingly, on remand, the Commissioner shall re-consider the evidence in the record regarding plaintiff's problems with persistence and pace and how any such limitation impacts plaintiff's ability to perform other work existing in significant numbers in the national economy.

VI.    This Case Should Be Remanded for Further Administrative Proceedings

The court may remand a case "either for additional evidence and findings or to award benefits." Smolen, 80 F.3d at 1292. Benefits may be awarded where "the record has been fully developed" and "further administrative proceedings would serve no useful purpose." Id.; Holohan v. Massanari, 246 F.3d 1195, 1210 (9th Cir. 2001). Specifically, benefits should be awarded where:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting [the claimant's] evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

Smolen, 80 F.3d 1273 at 1292; McCartey v. Massanari, 298 F.3d 1072, 1076-77 (9th Cir. 2002). Because issues still remain with respect to whether or not plaintiff is capable of performing other work existing in significant numbers in the national economy, this matter should be remanded to the Commissioner for further administrative proceedings.

CONCLUSION

Based on the foregoing discussion, the court should find the ALJ improperly determined plaintiff was not disabled, and should reverse the ALJ's decision and remand this matter to the Commissioner for further administrative proceedings in accordance with the findings contained herein.

Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 72(b), the parties shall have ten (10) days from service of this Report and Recommendation to file written

1  objections thereto. <u>See also</u> Fed. R. Civ. P. 6.  Failure to file objections will result in a waiver of those

2  objections for purposes of appeal. <u>Thomas v. Arn</u>, 474 U.S. 140 (1985).  Accommodating the time limit

3  imposed by Fed. R. Civ. P. 72(b), the clerk is directed set this matter for consideration on **November 11,**

4  **2005**, as noted in the caption.

5          DATED this 13th day of October, 2005.

9          Karen L. Strombom
          United States Magistrate Judge

REPORT AND RECOMMENDATION
Page - 22